[No. E058963. Fourth Dist., Div. Two. Aug. 19, 2014.]

In re J.S. et al., Persons Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,
Plaintiff and Respondent, v.
A.S. et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IVA., V, VII, and VIII.

COUNSEL

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant A.S.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant P.B.

Jean-Rene Basle, County Counsel, Kristina M. Robb and Adam Ebright, Deputy County Counsel, for Plaintiff and Respondent.

Nicole A. Williams, under appointment by the Court of Appeal, for Minors.

OPINION

**RICHLI, Acting P. J.**—A.S. (the mother) and P.B. (the father) appeal from orders asserting dependency jurisdiction over their children, N.S. and J.S. (collectively the children), and removing the children from their custody.

In the unpublished portion of this opinion, we will hold that there was insufficient evidence to support jurisdiction based on the mother's alleged failure to protect the children against sexual abuse by the father. However, there was sufficient evidence to support jurisdiction based on the mother's

substance abuse; moreover, the juvenile court also found jurisdiction on other grounds, which the parents do not challenge.

■ In the published portion of this opinion, we will hold that there was sufficient evidence to support the removal of the children from both parents based on domestic violence. We will also hold that, even though the father's 1997 Kentucky conviction for second degree sexual abuse was a misdemeanor under Kentucky law, it constituted a "violent felony" for purposes of the denial of reunification services under California law.

We find no other error. Accordingly, we will modify the jurisdictional findings, and we will affirm the jurisdictional and dispositional orders as modified.

I

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Detention Phase.*

The mother and the father have two sons together, N.S. and J.S. N.S., the older boy, was born in 2007; he was five when this dependency was filed, and he is seven now. J.S., the younger boy, was born in 2010; he was two when this dependency was filed, and he is five now.

The father is the presumed father of N.S. However, the mother claimed another man was N.S.'s biological father. That other man denied paternity; he was named in the dependency as an alleged father. The father is both the presumed and the biological father of J.S.

In March 2012, San Bernardino County Children and Family Services (Department) received a report that the children were being abused. Allegedly, the father used drugs, and the mother allowed the children to visit the father, even though he was a registered sex offender. When the Department investigated, the mother agreed not to let the father visit the children. Because she "appeared protective," the investigation was closed.

Also in March 2012, the police searched the father's home pursuant to a warrant. They found a shotgun hidden between the mattress and box spring of his bed and bullets in a shed. They also found marijuana on a dresser; the marijuana was accessible to the children, who were in the home at the time. The father claimed to have a medical marijuana recommendation. Eventually,

he pleaded nolo contendere to unlawful possession of a firearm and unlawful possession of ammunition; charges of child endangerment and failure to register as a sex offender were dropped. He was sentenced to 16 months; with applicable credits, he was actually incarcerated for eight months, from March through November 2012.

In December 2012, the Department received a "hotline" report that the children were being abused. Allegedly, the mother hit J.S., the mother did not cook for J.S., and the mother had been prescribed Prozac but did not take it.

As a result, in February 2013, social workers interviewed the father. The children were in his home at the time.[1]

The father denied that the mother hit the children. However, he confirmed that she did not take her prescription Prozac. He said that she had "mental health illnesses."

Initially, the father also said that the mother did not use drugs. However, he then volunteered that she used methamphetamine and marijuana and was currently staying with her uncle in Simi Valley to "detox."

The father admitted that, in 1997, he had been convicted of a sexual offense in Kentucky. However, he denied actually committing the offense. He explained that his ex-wife had accused him falsely of molesting her then 10-year-old daughter. He also admitted prior convictions for possession of ephedrine with the intent to manufacture methamphetamine, possession of a controlled substance, and driving under the influence.[2]

After this interview, the Department detained the children and filed dependency petitions as to them. They were placed in a foster home.

A social worker then interviewed the mother.

The mother admitted that she had been prescribed Prozac for bipolar disorder but had not taken it for a year because she no longer had Medi-Cal.

---

[1] It was not entirely clear where the children normally lived.

The father said that N.S. was living with the mother, and J.S. was living with him. However, he also indicated that the mother had only "dropped off" J.S. temporarily.

N.S. said that both he and J.S. "stay[ed]" with the father.

Later, the mother said that she and the father had agreed that the children would stay with him three days a week; however, she complained that he was not living up to this agreement.

[2] A criminal history search revealed an additional conviction for carrying a loaded firearm in a public place.

The mother also admitted that she used marijuana daily; she had started using it when she was 13. She admitted having used methamphetamine in the past but claimed to have stopped in March 2007.

The mother said that she did not know the father was a sex offender until the March 2012 investigation. She claimed she did not know that the children were not supposed to have contact with him. When reminded that she had agreed to that in March 2012, she said she thought it was "okay" for him to have contact with the children because the charges of child endangerment and failure to register as a sex offender had been dropped.

The mother admitted that she and the father had engaged in mutual domestic violence since 2008; the most recent incident was in December 2012. She also admitted that the children had been present during the domestic violence.

B. *Jurisdictional Phase.*

The mother's first drug test was positive for marijuana. She told a social worker that she used marijuana in lieu of Prozac for her bipolar disorder. She indicated that she was going to start taking Prozac again because she had located an inexpensive source. Just two days before making this statement, however, she had obtained a physician's recommendation for medical marijuana.

The father's first drug test was invalid due to signs that he had "attempt[ed] to flush the system." He admitted using marijuana "occasional[ly]" but agreed to quit.

The social worker made an effort to locate records relating to the father's sexual offense. The Kentucky court's case file could not be found; the records may have been destroyed in the ordinary course of business. However, the social worker was able to locate copies of some relevant records.

According to the criminal complaint, the father "placed his finger in" and "stroked" the "vaginal area" of a 10-year-old girl. "[The] victim's pants and panties were pulled down."

According to other records, the father was charged with first degree sexual abuse. This was later amended to "sexual abuse (solicitation)." The father

was ultimately convicted of second degree sexual abuse. (Ky. Rev. Stat. Ann., former § 510.120.) We take judicial notice[3] that this statute, as relevant here, provided:

> "(1) A person is guilty of sexual abuse in the second degree when: [¶] . . . [¶]

> "(b) He subjects another person who is less than fourteen (14) years old to sexual contact.

> "(2) Sexual abuse in the second degree is a Class A misdemeanor."

"Sexual contact" was defined as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party . . . ." (Ky. Rev. Stat. Ann. former § 510.010(7).)

The father was sentenced to 28 days in jail and 337 days of probation. According to him, he was not required to register as a sex offender in Kentucky. However, he was registered as a sex offender in California, based on the Kentucky conviction.

Once again, the father denied actually committing the offense. He explained that his girlfriend's 10-year-old daughter was playing outside "and got a burr in her genital area and he helped her remove it. A neighbor witnessed this and told the mom. . . . [The girlfriend] wanted to leave him

---

[3] Minors' counsel is under the impression that the father was convicted of solicitation to commit first degree sexual abuse. On that basis, she has asked us to take judicial notice of the Kentucky solicitation (Ky. Rev. Stat. Ann., § 506.030) and first degree sexual abuse statutes (Ky. Rev. Stat. Ann., § 510.110).

We read the record differently. Minors' counsel is relying on the notation in the uniform crime report that the charge against the father had been amended to "sexual abuse (solicitation)." The Kentucky solicitation statute, however, prohibits "command[ing] or encourag[ing] another person" to commit a crime. (Ky. Rev. Stat. Ann., § 506.030(1).) It is clear that the father did not solicit *a third person* to commit sexual abuse *against the victim*. Other records indicated that the father was required to register as a sex offender in California because he had been convicted in Kentucky of "second degree sexual abuse"—not solicitation.

We therefore conclude that the father was actually convicted of second degree sexual abuse. (Ky. Rev. Stat. Ann., § 510.120.) The vague notation on the uniform crime report must mean that he was charged with committing sexual abuse by (or in the course of) soliciting *the victim*.

Finally, what matters is how the relevant Kentucky statutes read in 1997, not how they read today. Accordingly, we will take judicial notice of Kentucky Revised Statutes Annotated, section 510.120, as it stood in 1997. (1988 Ky. Acts, ch. 283, § 14, p. 688.)

We will also take judicial notice of Kentucky Revised Statutes, section 510.010, as it stood in 1997 (1996 Ky. Acts, 1996, ch. 300, § 2, p. 1206), because it defined "[s]exual contact" as used in Kentucky Revised Statutes Annotated, section 510.120.

any way [*sic*] and took this information and ran with it." He pleaded guilty just "to get out of jail."

N.S. denied any sexual abuse. J.S. was too young to be interviewed.

The mother took four drug tests—three in April 2013 and one in May 2013. The first was positive; the second was negative but had a suspicious specimen temperature; the third was positive; and the fourth was negative.

The father also took four drug tests, all negative.

In the jurisdictional/dispositional report, the Department recommended that the children be removed and that both parents be given reunification services. Prior to the hearing, however, as a result of mediation, the Department and the parents agreed that the children should be placed with the mother on a family maintenance plan. Minors' counsel did not agree with this and requested a contested hearing.

After a further mediation session, the Department and the father agreed that the father should receive reunification services. Again, minors' counsel did not agree with this.

### C. *The Jurisdictional/Dispositional Hearing.*

In June 2013, at the jurisdictional/dispositional hearing, all of the social worker's reports were admitted into evidence. In addition, there was the following oral testimony.

The mother's adult daughter testified that she had lived with both the mother and the father for about a year and a half, between the ages of 16 and 17. During this time, she never saw any inappropriate behavior by the father.

The mother testified that, when the children were detained, she was staying with her uncle, but she denied that she was there to "detox." She had used methamphetamine between the ages of 13 and 16, stopping when she was pregnant with her daughter; she had used it again between the ages of 30 and about 32, stopping when she met the father.

The mother denied using any marijuana since the children were detained. She explained that she had had positive drug tests because "it takes up to three months to get out of your system." She was taking Prozac and lorazepam for her bipolar disorder. She was under treatment by both a psychiatrist and a general practitioner.

The mother testified that she did not believe the father had been convicted of a sexual offense, because he was not required to register in Kentucky. However, she promised to follow any court orders limiting his contact with the children.

The father testified that he and the mother shared custody of the children: "We worked out an agreement that I would have them . . . three days a week, she would have them four, and at various times that would alter where I would have them four days, she would have them three."

He denied any domestic violence.

He reiterated that his Kentucky conviction arose out of the removal of burrs from his girlfriend's daughter's panties, at the child's request. He denied removing her panties or touching her vagina.

According to the father, he had been advised that, under Kentucky law, because he was not the girl's biological father, he "wasn't supposed to be touching [her] whatsoever." Based on that understanding, he pleaded guilty.

The juvenile court sustained the following allegations as to both children:

"B-1 The mother . . . failed to protect the child . . . in that her substance abuse issues severely impact her ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

"B-2 The mother . . . has unresolved mental health needs which severely impact her ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

"B-3 The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a history of sexually offending minors [*sic*], history of violent assaultive behavior, history of anger management issues, history of drug deals, all of which place the child[] . . . at a significant and substantial risk o[f] harm and/or death.

"B-4 The mother . . . engages in acts of domestic violence with the father . . . while in the presence of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or abuse."

In addition, it sustained the following allegations solely as to J.S.:

"B-5 The father . . . failed to protect the child . . . in that his substance abuse issues severely impact his ability to provide for the well[-]being of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or neglect.

"B-7 The father . . . failed to protect the child . . . in that he engages in acts of domestic violence with the mother . . . while in the presence of the child[,] which places [the child] at a significant and substantial risk of harm and[/]or abuse."[4]

The juvenile court therefore found jurisdiction based on failure to protect. (Welf. & Inst. Code, § 300, subd. (b).) It formally removed the children from the parents' custody. It ordered reunification services for the mother; however, it denied reunification services for the father, on two grounds: (1) that he had been convicted of a violent felony (Welf. & Inst. Code, § 361.5, subd. (b)(12)) and (2) that he was required to register under the Adam Walsh Child Protection and Safety Act of 2006 (*id.*, subd. (b)(16)).

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

## DISPOSITIONAL FINDINGS

Both parents contend that there was insufficient evidence to support the removal of the children from their custody.

 "Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. [Citations.] The jurisdictional findings are prima facie evidence the minor cannot safely remain in the home. [Citations.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136 [157 Cal.Rptr.3d 693].)

"We review the court's dispositional findings for substantial evidence. [Citations.]" (*In re T.V., supra,* 217 Cal.App.4th at p. 136.) Both parents stress the fact that the burden of proof in the lower court is clear and convincing

---

[4] These allegations were omitted from the petition as to N.S., presumably because there was a question as to whether the father was N.S.'s biological father.

The petition as to N.S. did include allegations as to the other man who was N.S.'s alleged father. Those allegations, however, would not have been sufficient to support jurisdiction in the absence of allegations as to the mother.

*See footnote, *ante*, page 1483.

evidence. But "[t]he 'clear and convincing' standard is for the edification and guidance of the juvenile court. It is not a standard for appellate review. [Citation.] ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, "the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong." [Citation.]' [Citation.]" (*In re J. I.* (2003) 108 Cal.App.4th 903, 911 [134 Cal.Rptr.2d 342].)

A. *Removal from the Mother Based on Substance Abuse.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Removal from Both Parents Based on Domestic Violence.*

Domestic violence afforded cause to remove the children from both parents. The mother admitted incidents of mutual domestic violence going back to 2008. The mother argues that it was no longer a concern, because she was not living with the father. However, she admitted that the most recent incident was in December 2012, when they were already not living together. Meanwhile, in the social worker's opinion, the mother was "dependent" on the father. There was still a "relationship" between them; they had "various needs for each other." Thus, again, the juvenile court could reasonably find that removal was necessary.

The father relies on *In re Basilio T.* (1992) 4 Cal.App.4th 155 [5 Cal.Rptr.2d 450], which held that two incidents of domestic violence between the parents afforded insufficient evidence to support removal, because "neither incident directly affected either minor physically . . . ." (*Id.* at p. 171.)

■ The law, however, has changed significantly since *Basilio T.* was decided. At that time, the relevant subdivision of Welfare and Institutions Code section 361 allowed removal only if there was "a substantial danger to the physical health of the minor . . . ." (Welf. & Inst. Code, former § 361, subd. (b)(1); Stats. 1990, ch. 182, § 7, p. 1307.) Since then, however, the subdivision has been amended (Stats. 1996, ch. 1084, § 4, p. 7606; Stats. 1996, ch. 1139, § 8.5, p. 8145) so that it now allows removal if there is "a substantial danger to the physical health, *safety, protection, or physical or*

---

* See footnote, *ante,* page 1483.

*emotional well-being* of the minor . . . ." (Welf. & Inst. Code, § 361, subd. (c)(1), italics added.) Ongoing domestic violence, committed by both parents, in the presence of the children, from 2008 through 2012, is substantial evidence of a substantial danger to the children's emotional well-being, if not their physical well-being.

## V

## THE FATHER'S RIGHT, AS A NONOFFENDING PARENT, TO CUSTODY OF N.S.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI

## THE DENIAL OF REUNIFICATION SERVICES TO THE FATHER

The father contends that the juvenile court's reasons for denying him reunification services were not supported by substantial evidence.

As discussed, the father had been convicted of second degree sexual abuse under Kentucky law. Although this was a misdemeanor, it was equivalent to the California felony of a lewd and lascivious act with a child under 14. (Pen. Code, § 288, subd. (a).)

■ Under Welfare and Institutions Code section 361.5, subdivision (b)(12) (subdivision (b)(12)), a parent is not entitled to reunification services when the court finds, by clear and convincing evidence, "[t]hat the parent . . . has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code."

Penal Code section 667.5 provides enhancements for prior prison terms. If the defendant is convicted of a violent felony, and if the defendant served a prior prison term for a violent felony, it provides (subject to exceptions not relevant here) for a three-year enhancement. (Pen. Code, § 667.5, subd. (a).) If either the current offense or the prior offense was not a violent felony, it provides for a one-year enhancement. (Pen. Code, § 667.5, subd. (b).)

■ Accordingly, Penal Code section 667.5, subdivision (c) (Penal Code subdivision (c)) defines "violent felony." That definition includes a "[l]ewd or lascivious act as defined in subdivision (a) or (b) of Section 288." (Pen. Code, § 667.5, subd. (c)(6).)

---

*See footnote, *ante*, page 1483.

Penal Code section 667.5, subdivision (f) (Penal Code subdivision (f)), however, also provides, "A prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law *if the defendant served one year or more in prison for the offense in the other jurisdiction.*" (Italics added.)

The father therefore argues that a foreign prior is not a violent felony within the meaning of section 361, subdivision (b)(12) unless the parent served a year or more in prison on the conviction. In his case, the Kentucky offense was a misdemeanor (Ky. Rev. Stat. Ann., former § 510.120(2)), and he served only 28 days in jail.

However, while section 361, subdivision (b)(12), specifically refers to and borrows Penal Code subdivision (c), it does not mention subdivision (f). And this makes sense. For purposes of a prior prison term enhancement, what matters is the *actual* service of a *felony* term. By contrast, for purposes of the denial of reunification services, what matters is the underlying criminal *conduct*; the *punishment* imposed is irrelevant. Significantly, other statutes that are similarly triggered by particular California felonies are also triggered by any foreign crime that has the same elements, without regard to the punishment imposed. (E.g., Pen. Code, §§ 667, subd. (d)(2), 667.51, subd. (b), 667.6, subd. (e)(10), 667.61, subd. (d)(1), 667.71, subd. (c)(13).)

It could be argued that, if section 361, subdivision (b)(12), borrows only Penal Code subdivision (c) and not subdivision (f), then it does not apply to foreign convictions at all. For the following reasons, however, we conclude that subdivision (c), all by itself, includes both California and foreign convictions.

In defining violent felonies, Penal Code subdivision (c) takes a mix of different approaches. In some instances, it simply specifies a common law felony. For example, subdivision (c)(1) lists "[m]urder or voluntary manslaughter"; subdivision (c)(9) lists "[a]ny robbery." Presumably these would include both in-state and foreign convictions. (*People v. Perry* (1962) 204 Cal.App.2d 201, 204 [22 Cal.Rptr. 54] [Pen. Code, § 666, defining petty theft with a prior, applies where prior theft conviction was out of state].)

In other instances, it specifies a felony "as defined in" a certain Penal Code section. For example, in this case, we are dealing with subdivision (c)(6), which lists a "[l]ewd or lascivious act as defined in subdivision (a) or (b) of Section 288." Although the question is more subtle, this appears to include both in-state and foreign convictions; a lewd act committed out of state is still

a lewd act *as defined* by California law, even though not *punishable under* California law.

In still other instances, however, Penal Code subdivision (c) specifies a felony "in violation of" a certain Penal Code section. For example, subdivision (c)(10) lists "[a]rson, in violation of subdivision (a) or (b) of Section 451"; subdivision (c)(16) lists "[c]ontinuous sexual abuse of a child, in violation of Section 288.5." This is ambiguous. It could be strictly construed to require that the prior must have been committed within California's territorial jurisdiction (see Pen. Code, § 777 et seq.), so as to violate the cited statute. Alternatively, however, it could be more broadly construed to require that the conduct underlying the prior *would have violated* the cited statute, *if* committed in California.

It would be absurd to suppose that the Legislature intended these minor differences in wording to make a substantive difference with regard to the effect of a foreign prior. It must be remembered that Penal Code subdivision (c), when originally drafted, did not need to be very precise in specifying its territorial reach, because subdivision (f) went on to provide that "[a] prior conviction of a particular felony shall include a conviction in another jurisdiction for an offense which includes all of the elements of the particular felony as defined under California law *if the defendant served one year or more in prison for the offense in the other jurisdiction.*" (Italics added.) In other words, even under Penal Code section 667.5, as originally drafted, subdivision (c) included both in-state and foreign convictions; subdivision (f) then served as a *limitation* on the inclusion of foreign convictions, so that they were included only if the defendant served at least a year in prison.

Later, when section 361.5, subdivision (b)(12), was enacted, the Legislature borrowed Penal Code subdivision (c) as a list of the types of prior convictions that would disqualify a parent from reunification services, despite the handful of sub-subdivisions that used the ambiguous "in violation of" wording. At the same time, it declined to borrow subdivision (f), indicating its intent that the service of a prior prison term of a year or more should be irrelevant to reunification services. Accordingly, subdivision (b)(12) encompasses foreign convictions, without regard to whether the defendant served a year or more in prison.

We find support for our conclusion in *People v. Hazelton* (1996) 14 Cal.4th 101 [58 Cal.Rptr.2d 443, 926 P.2d 423], which dealt with Penal Code section 1170.12, the initiative version of the "Three Strikes" law. Penal Code section 1170.12, subdivision (b) "defin[ed] a 'prior conviction of a felony' as [including both]: '(1) Any offense defined in subdivision (c) of Section 667.5 as a violent felony or any offense defined in subdivision (c) of Section 1192.7

as a serious felony in this state'; [and] '(2) A conviction in another jurisdiction for an offense that, if committed in California, is punishable by imprisonment in the state prison [and] . . . includes all of the elements of the particular felony as defined in subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7' . . . ." (*Hazelton, supra,* at p. 105.) However, Penal Code former section 1170.12, subdivision (c)(2)(A) (Penal Code subdivision (c)(2)(A)), provided that third strike penalties applied to "a defendant [who] has two or more prior felony convictions, *as defined in paragraph (1) of subdivision (b)* . . . ." (*Ibid.,* italics added.) The defendant therefore argued that a foreign serious or violent felony conviction did not count as a strike for third strike purposes. (*Ibid.*)

The Supreme Court observed that Penal Code subdivision (c)(2)(A) was ambiguous: "[T]he phrase 'prior felony convictions, as defined in paragraph (1) of subdivision (b),' could be interpreted, as defendant suggests, to refer to the *forum* in which the prior conviction was obtained, i.e., an adult criminal proceeding in California. This interpretation would, of course, mean that out-of-state convictions, which are described in subdivision (b)(2), would not qualify for subdivision (c)(2)(A)'s third strike penalty. [¶] Alternatively, the same phrase could be interpreted as highlighting the *nature* of the prior conviction, i.e., a violent or serious felony, that will qualify as a prior felony conviction in a three strikes case. Because section 1170.12, subdivision (b)(2), includes only those out-of-state convictions deemed violent or serious in California, interpreting subdivision (c)(2)(A) to refer to the nature of the former conviction would mean that out-of-state convictions would qualify for the subdivision's third strike penalty." (*People v. Hazelton, supra,* 14 Cal.4th at pp. 105–106.) The court went on to conclude that the ambiguity should be construed in accordance with indicia that the voters intended out-of-state convictions to be strikes for third strike purposes. (*Id.* at pp. 107–108.)

In sum, *Hazelton,* like this case, involved a statute that borrowed Penal Code subdivision (c) but failed to borrow language specifically including foreign convictions. The court nevertheless held that that statute was ambiguous, and that its reference to subdivision (c) was intended to encompass *all* prior convictions of the *nature* specified in subdivision (c), regardless of whether they were in-state or foreign. For similar reasons, we come to the same conclusion here.

In a single sentence, the father also argues that there was insufficient evidence that the Kentucky conviction included all of the elements of a lewd act in violation of Penal Code section 288, subdivision (a) or (b). We deem this argument forfeited, "since it is not stated under a separate heading, is not

sufficiently developed, and is unsupported by citation to authority. [Citations.]" (*T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12 [120 Cal.Rptr.3d 477].)[9]

We therefore conclude that there was sufficient evidence to support the denial of reunification services under section 361.5, subdivision (b)(12). We therefore need not consider whether there was also sufficient evidence to support the denial of reunification services under section 361.5, subdivision (b)(16).

## VII, VIII[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IX

## DISPOSITION

The true finding on allegation B-3 in both petitions is modified as follows. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 771 [149 Cal.Rptr.3d 875].)

The following portion of the allegation is found not true: "The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a history of sexually offending minors [*sic*] . . . . . . which place[s] the child[] . . . at a significant and substantial risk o[f] harm and/or death."

The following portion of the allegation is still found true: "The mother . . . failed to protect the child . . . in that she intentionally left the child . . . in the care of [the father] knowing that he has a . . . history of violent assaultive behavior, history of anger management issues, history of drug deals, all of which place the child[] . . . at a significant and substantial risk o[f] harm and/or death."

---

[9] At oral argument, the father's counsel asserted that the California statute requires a specific intent that the Kentucky statute does not.

Under California law, a lewd act "requires 'the *specific intent* of arousing, appealing to, or gratifying the lust of the child or the accused.' [Citation.]" (*People v. Warner* (2006) 39 Cal.4th 548, 557 [47 Cal.Rptr.3d 1, 139 P.3d 475].) As already mentioned, under Kentucky law, second degree sexual abuse requires "the purpose of gratifying the sexual desire of either party . . . ." (Ky. Rev. Stat. Ann., former § 510.010(7).) Thus, it appears that anyone who has the specific intent required by the Kentucky statute also has the specific intent required by the California statute.

[*]See footnote, *ante*, page 1483.

The orders appealed from are affirmed as modified.

Miller, J., and Codrington, J., concurred.

A petition for a rehearing was denied September 10, 2014, and appellants' petitions for review by the Supreme Court were denied November 12, 2014, S221590.